UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUERDA OCCILIEN,

                    Plaintiff,

        v.

RELATED PARTNERS, INC.; ARTERO JIMENEZ;
KATHERINE BLOCK; HUDSON YARDS
CONSTRUCTION II HOLDINGS LLC; HUDSON
YARDS CONSTRUCTION II LLC; HUDSON
YARDS CONSTRUCTION LLC; RUSSELL TOBIN
& ASSOCIATES,

                    Defendants.

19 Civ. 7634 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Guerda Occilien, proceeding *pro se*, brings this employment

discrimination action against Related Partners, Inc., Artero Jimenez, Katherine

Block, Hudson Yards Construction II Holdings LLC, Hudson Yards

Construction II LLC, and Hudson Yards Construction LLC (collectively, the

"Related Defendants"), as well as Russell Tobin & Associates ("RTA," and

together with the Related Defendants, "Defendants").  Plaintiff brings claims

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C.

§ 1981, alleging a hostile work environment, sexual harassment, failure to hire,

and retaliation.  Defendants argue that these claims are governed by a Master

Employment Agreement (the "Master Agreement") that Plaintiff entered into

with RTA, which agreement contains a broad arbitration provision.  Defendants

now move, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to compel

arbitration of Plaintiff's claims and thereafter to dismiss the case.[1]  Plaintiff opposes the motion, arguing, *inter alia*, that she was not an employee of RTA at the time the alleged events occurred, and questioning the authenticity of the Master Agreement.  For the reasons set forth in the remainder of this Opinion, Defendants' motion to compel arbitration is granted and the instant action is stayed.

**BACKGROUND**[2]

### A.   Factual Background

### 1.   Plaintiff's Allegations

Defendant RTA is a company with its principal place of business in New York and it provides staffing services, such as temporary employees, to its clients.  (Hoffmann Aff. ¶ 5).  In or around August 2015, RTA entered into a

---

[1]   Defendants style their submissions as motions to dismiss, but because the relief sought is primarily to compel Plaintiff to arbitrate her claims and thereafter to dismiss the Complaint, the Court refers to the instant motion as one to compel arbitration.

[2]   The facts in this Opinion are drawn primarily from Plaintiff's Complaint ("Compl." (Dkt. #2)), and the Related Defendants' Third Party Complaint against Defendant RTA ("3d Party Compl." (Dkt. #40)), which are the operative pleadings in this case.  Facts are also drawn from the Affirmation of Andrew S. Hoffmann in Support of RTA's Motion to Compel Arbitration ("Hoffmann Aff." (Dkt. #29)), and the exhibits attached thereto.  For ease of reference, the Temporary Worker Agreement is referred to as "TWA" (Hoffmann Aff., Ex. A), and the Master Employment Agreement is referred to as "Master Agreement" (*Id.*, Ex. B).

For convenience, the Court refers to Defendant RTA's Memorandum of Law in Support of Its Motion to Compel Arbitration as "RTA Br." (Dkt. #48); Plaintiff's letter dated July 22, 2020, in opposition to Defendants' motion to compel arbitration as "Pl. 1st Opp." (Dkt. #53); Plaintiff's letter dated July 29, 2020, in opposition to Defendants' motion to compel arbitration as "Pl. 2d Opp." (Dkt. #54); the Reply Affirmation of Andrew S. Hoffmann in Further Support of RTA's Motion to Compel Arbitration as "Hoffmann Reply Aff." (Dkt. #56); the Related Defendants' letter reply in further support of Defendants' motion to compel arbitration as "Related Reply" (Dkt. #57); Plaintiff's sur-reply dated October 20, 2020, as "Pl. Sur-Reply" (Dkt. #62); and RTA's letter in response to Plaintiff's sur-reply as "RTA Reply" (Dkt. #64).

Temporary Worker Agreement (the "TWA") with The Related Companies, L.P. ("Related"), pursuant to which agreement RTA was to place qualified individuals as temporary workers with Related and its subsidiaries, including the Related Defendants. (*See generally* TWA; *see also* 3d Party Compl. ¶ 7). On August 15, 2016, Plaintiff entered into the Master Agreement with RTA, which agreement the parties executed on August 22, 2016. (*See generally* Master Agreement). Under the terms of the Master Agreement, RTA hired Plaintiff to provide services to RTA's client, identified in the agreement as Related. (*Id.* at ¶¶ 1-2).

Plaintiff, a Black woman of Haitian national origin, started working for Related on August 16, 2016, initially filling in for a treasury analyst out on maternity leave. (Compl. ¶ III.A; *id.*, Ex. A; *see also* Hoffmann Aff. ¶ 9)). When Plaintiff began working at Related, her supervisor was Katherine Block, Vice President of Treasury. (Compl., Ex. A). Plaintiff alleges that within a few weeks of starting, a co-worker, Defendant Artero Jimenez, began "calling after" Plaintiff and touching Plaintiff's shoulder. (*Id.*). Jimenez also referred to Plaintiff as "low energy," despite Plaintiff's "competent[] and admirabl[e]" job performance. (*Id.*).

On November 28, 2016, the employee for whom Plaintiff was filling in returned to work. (Compl., Ex. A). Block asked that Plaintiff continue to work at Related and told Plaintiff that she would "try to get [Plaintiff] a permanent position" with Related. (*Id.*). Shortly thereafter, Plaintiff was transferred to

work for Jimenez at a different Related subsidiary on or around December 6, 2016. (*Id.*). On Plaintiff's first day reporting to Jimenez, Plaintiff had a meeting with Jimenez, at which meeting Plaintiff alleges that Jimenez:

> told [Plaintiff] that [Plaintiff] was here to be hired and that [Jimenez] would do all he can to get [Plaintiff] hired. Soon after, [Jimenez] uncrossed his legs, leaned towards [Plaintiff] with his front pants zipper open, held his neck tie, which was still on his neck, and used his tie to slap the top of [Plaintiff's] thighs. [Plaintiff] immediately informed Mr. Jimenez that his actions were unwelcome and unprofessional.

(*Id.*). Plaintiff complained to Block about Jimenez's behavior later the same day. (*Id.*).

Plaintiff alleges that "immediately" after this meeting with Jimenez, and after Plaintiff complained to Block about Jimenez's behavior, Jimenez began to retaliate against Plaintiff. (Compl., Ex. A). Jimenez made Plaintiff's work environment "so hostile" that the following month, Plaintiff returned to Block "crying and complaining" about Jimenez's actions, and requesting that Block fire Plaintiff. (*Id.*). At some point, Plaintiff also complained to Jimenez's manager, Nicholas Tzakas. (*Id.*). Plaintiff alleges that in mid-July 2017, Jimenez walked towards her and attempted to grab her crotch, but that Plaintiff put up her hands to stop the advance and Jimenez walked away. (*Id.*). According to Plaintiff, the Related Defendants never addressed or remedied her complaints about the harassment she experienced. (*Id.*). Instead, their "only response was an empty apology that did nothing to change the inappropriate behavior." (*Id.*).

At some point thereafter, Plaintiff ceased working for the Related Defendants. (Compl., Ex. A; *see also* Related Def. Reply 1 (explaining that Plaintiff's placement with Related continued for approximately nine months after the employee on leave returned to Related); Pl. 1st Opp. 2 (claiming that Jimenez sexually harassed Plaintiff for nine months)). Despite assurances from Block and Jimenez, Defendants failed to hire Plaintiff into a permanent position, allegedly for discriminatory reasons. (*See* Compl. ¶ IV.A; *id.*, Ex. A). Specifically, Plaintiff alleges that one of the Related subsidiaries did not "hire black for this contract," and that they did not hire any permanent Black employees from December 2016 until July 2017, although during the same period they hired non-Black employees into permanent positions. (*Id.*, Ex. A).

In Plaintiff's opposition papers to the instant motion, she clarifies that she believes her employment contract with RTA, pursuant to which she was assigned to fill in for the employee out on maternity leave, expired in November of 2016. (*See, e.g.*, Pl. 1st Opp. 2-4). She further alleges that her subsequent placement with another Related subsidiary, where she reported to Jimenez, was improper and exploitative. (*See* Pl. 2d Opp. 2 ("Related Partners, Inc. is the one who needs to understand that it was not my employer, nor my recruiter; therefore had no business placing me with Hudson Yards Construction LLC. Placing me with Hudson Yards Construction LLC violated labor law, Related Partners, Inc[.] knew that and did it anyway.")). However, Defendants maintain that throughout Plaintiff's placement at all Related

subsidiaries, pursuant to the TWA and the Master Agreement, RTA "was responsible for the payment of Plaintiff's wages and compensated Plaintiff for the services she provided to Related," and "retained control and authority over the terms and conditions of Plaintiff's employment." (Hoffmann Aff. ¶¶ 10-11).

### 2. The Relevant Agreements

There are two employment agreements pertinent to the instant motion. First is the Master Agreement between Plaintiff and RTA, which Plaintiff signed on August 22, 2016. (*See generally* Master Agreement). Second is the TWA, the agreement between RTA and Related, dated August 7, 2015. (*See generally* TWA).

Pursuant to the Master Agreement, RTA hired Plaintiff to provide services to RTA's "Client," identified in the agreement as Related. (Master Agreement ¶¶ 1-2). The Master Agreement provides that the term of employment "shall continue through the completion of [Plaintiff's] Services unless terminated" (*id.* at ¶ 4), and that Plaintiff "shall diligently and continuously prosecute and complete the Services on or before the date specified by [RTA] and/or the Client [*i.e.*, Related]" (*id.* at ¶ 3).[3] However, the Master Agreement does not specify a termination date. (*See generally id.*).

---

[3]     The Master Agreement defines "Services" as follows:

> 2. **Services.**   Employee agrees to furnish the Services in a workmanlike and professional manner, and in accordance with all applicable standard of the industry and requirements of the Client and [RTA].   Employee shall promptly correct, at no additional cost to [RTA], any Services found to be defective by [RTA] or the Client.

(Master Agreement ¶ 2).

The Master Agreement specifies, *inter alia*, that "[a]t all times during the term hereof Employee [*i.e.*, Plaintiff] shall be and remain and employee of [RTA] and not an employee of the Client." (Master Agreement ¶ 7).  The agreement limits Plaintiff's communications with Related over the terms and conditions of her employment and requires her to communicate about these issues exclusively through RTA. (*Id.* at ¶ 11).  The Master Agreement also provides that RTA will pay Plaintiff's salary and that RTA must approve in advance any off-schedule overtime that Plaintiff works. (*Id.* at ¶ 6).

The Master Agreement also contains an arbitration provision (the "Arbitration Provision"), that reads in relevant part:

> 13. **Arbitration**. Except as noted herein, [RTA] and Employee agree and consent that any dispute arising between them or between Employee and Client concerning Employee's employment with [RTA] as well as any claim by Employee for unpaid wages or other compensation as well as any claim by Employee of employment discrimination or improper treatment in connection with such employment shall be submitted to arbitration before the American Arbitration Association in New York City pursuant to its labor arbitration rules and before a single Arbitrator.  [RTA] and Employee's agreement to arbitration shall include, without limiting the generality of the foregoing, any claims based upon the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1866, 1964, and 1991, the Age Discrimination in Employment Act, the Americans With Disabilities Act of 1990, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, New York Labor Law, New York State and City Human Rights Law or any other additional, related or comparable federal, state or local statute, regulation or ordinance or otherwise[.]

(Master Agreement ¶ 13).  The agreement also contains a merger clause specifying that "this Agreement constitutes the entire understanding between the parties and there are no other agreement or understandings, either written or oral, concerning the subject matter hereof." (*Id.* at ¶ 15).  The Master Agreement is dated August 15, 2016, and was executed by RTA and Plaintiff on August 22, 2016.  (*See generally id.*).

The TWA governs the terms between RTA and Related with respect to RTA's placement of temporary employees with RTA's "Client," specified in the agreement as Related.  (*See generally* TWA).  Pursuant to the TWA, RTA was to place temporary employees at Related and its subsidiaries.  (Hoffmann Aff. ¶ 6; *see also* Related Reply 1-2).  The TWA further provides that "[s]elected candidates deemed employees of [RTA] will be contracted by [RTA] to Client." (TWA ¶ 1.b).  Under the TWA, temporary employees placed by RTA with Related and its subsidiaries were to be paid by RTA, for which RTA would invoice Related.  (*Id.* at ¶ 1.d).

## B.    Procedural Background

Plaintiff, proceeding *pro se*, initiated this action on August 14, 2019, by filing a complaint against the Related Defendants.  (Dkt. #2).  On September 19, 2019, Chief Judge Colleen McMahon granted Plaintiff's motion to proceed *in forma pauperis*.  (Dkt. #4).  On September 26, 2019, the case was assigned to this Court.  (Minute Entry of September 26, 2019).  By Order dated September 26, 2019, the Court referred the case to mediation pursuant to the

Court's Mediation Program for *pro se* employment discrimination cases and ordered that the Clerk of Court attempt to locate *pro bono* counsel for the limited purpose of assisting Plaintiff in mediation.  (Dkt. #7).  *Pro bono* counsel entered a notice of limited appearance to represent Plaintiff in mediation on November 13, 2019.  (Dkt. #14).

Before mediation could begin, on December 6, 2019, the Related Defendants and RTA submitted a joint letter to the Court indicating the Related Defendants' intent to implead RTA as a necessary party, and RTA's intent to move to compel arbitration after being added to this litigation.  (Dkt. #16).  The Court scheduled a conference for January 9, 2020, to discusses the issues raised in the December 6, 2019 letter (Dkt. #17), and stayed Defendants' deadline to respond to the Complaint until after the conference (Dkt. #19).

At the January 9, 2020 conference, RTA made an oral application to intervene, and the parties discussed proceeding with mediation prior to any motion practice.  (*See* Dkt. #25 (Transcript)).  Plaintiff was instructed to inform the Court whether she wanted to proceed with mediation and whether she opposed RTA being added as a defendant to this case.  (*Id.*).  By letter dated January 16, 2020, Plaintiff notified the Court that she wished to proceed with mediation with the Related Defendants and RTA (Dkt. #20), and on January 23, 2020, the Court granted RTA's application to intervene (Dkt. #21).

On March 9, 2020, the court-appointed mediator filed a report notifying the Court that mediation had been unsuccessful.  (Dkt. #27).  By Order dated

March 11, 2020, the Court set a deadline of April 1, 2020, for Defendants to respond to the Complaint.  (Dkt. #29).  On April 1, 2020, the Related Defendants answered Plaintiff's Complaint and filed a third-party complaint against RTA seeking indemnification.  (*See* Dkt. #36-37, 39-40).

On April 24, 2020, RTA filed the instant motion to compel arbitration (Dkt. #46-48), and on April 27, 2020, the Related Defendants joined RTA's motion (Dkt. #49).  By Order dated April 27, 2020, the Court set a briefing schedule, and due to the COVID-19 pandemic, accepted as timely RTA's late response to the Complaint and waived the Court's requirement for a pre-motion conference.  (Dkt. #50).  Rather than filing an opposition to the motion to compel arbitration by the June 29, 2020 deadline, Plaintiff filed a letter dated July 22, 2020, seeking to have certain documents stricken from the record, objecting to the validity of the Master Agreement, requesting production of certain documents, and disputing the affirmative defenses asserted by the Related Defendants in their Answer.  (Dkt. #53).  The Court denied without prejudice Plaintiff's motion to strike and motion to compel, and granted Plaintiff another opportunity to file an opposition to the motion to compel arbitration.  (Dkt. #52).  Plaintiff submitted a second letter dated July 29, 2020.  (Dkt. #54).[4]  RTA filed a reply affirmation in further support of its

---

[4]     In order to construe Plaintiff's submissions as raising the strongest arguments they suggest, the Court considers both of Plaintiff's letters in deciding the instant motion. *See Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) ("It is well established that the submissions of a *pro se* litigant must be construed

motion to compel arbitration on August 31, 2020 (Dkt. #56), and the Related Defendants submitted a letter in reply to Plaintiff's opposition letters on September 2, 2020 (Dkt. #57).

By letter dated September 14, 2020, Plaintiff sought leave to submit certain documents to the Court and raised additional arguments on the merits of Defendants' motion to compel arbitration. (Dkt. #58). The Court construed Plaintiff's letter as a request to submit a sur-reply and granted her request. (Dkt. #59). Instead of submitting a sur-reply, Plaintiff submitted a letter seeking to compel the production of certain documents, which motion the Court denied without prejudice pending resolution of the motion to compel arbitration. (*See* Dkt. #60-61). The Court also granted Plaintiff another opportunity to file a sur-reply. (*See* Dkt. #61). By letter dated October 20, 2020, Plaintiff submitted a sur-reply and several documents. (Dkt. #62). This motion became fully briefed and ripe for decision on November 2, 2020, when RTA submitted a response to Plaintiff's sur-reply. (Dkt. #64).

## DISCUSSION

### A.    Applicable Law

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*,

---

liberally and interpreted 'to raise the strongest arguments that they suggest.'" (quoting *Pabon* v. *Wright*, 459 F.3d 241, 248 (2006))).

868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted).  Section 2 of the FAA provides that "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement.  *Id.* § 4.  A court ruling on a petition to compel arbitration must decide two issues: (i) whether the parties agreed to arbitrate, and, if so, (ii) whether the scope of that agreement encompasses the claims at issue.  *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

A court resolving a motion to compel arbitration applies a standard similar to that for summary judgment.  *Meyer*, 868 F.3d at 74 (quoting *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  In doing so, "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Id.* (internal quotation marks, alterations, and citations omitted).  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala.* v.

12

*Randolph*, 531 U.S. 79, 91 (2000).  A party opposing arbitration may not satisfy this burden through "general denials of the facts on which the right to arbitration depends"; in other words, "[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried."  *Oppenheimer & Co.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

In accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," a court must resolve any doubts concerning the scope of arbitrable issues "in favor of arbitrability."  *Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *State of N.Y.* v. *Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)), *cert. denied*, 140 S. Ct. 1117 (2020).  In so doing, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Id.* (internal quotation marks and citation omitted).

Whether parties agreed to arbitrate is determined under state law.  *See Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract ... the ultimate question of whether the parties agreed to arbitrate is determined by state law.").  Under

New York law,[5] the party seeking arbitration must prove by a preponderance of the evidence that a valid arbitration agreement exists.  *Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993). A valid arbitration agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement[.]"  *In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).  By signing a written instrument, a party creates presumptive evidence of its assent to enter into a binding agreement.  *See, e.g.*, *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *Gillman* v. *Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988) (holding that a party's signature generally creates a presumption that the party assented to the terms of the agreement).

**B.    Analysis**

   **1.    The Parties Agreed to Arbitrate**

Defendants argue that Plaintiff was an employee of RTA throughout the course of her placement at Related and its subsidiaries, and that therefore the Master Agreement and the Arbitration Provision apply to Plaintiff's claims.  (*See* RTA Br. 3-4; Related Reply 1-2; *see also* Hoffmann Aff. ¶¶ 11-15).  Plaintiff

---

[5]    Where, as here, a court exercises supplemental jurisdiction over New York state law claims, the court applies New York choice of law rules, *see North Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 43 (2d Cir. 1999), according to which claims that involve regulation of conduct are determined by the "law of the locus jurisdiction," *AroChem Int'l, Inc.* v. *Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (citing *Schultz* v. *Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 198 (1985)).  Because all acts and omissions giving rise to the claims in this case took place in New York, the Court applies New York law to assess whether the parties agreed to arbitrate.

raises numerous arguments in opposition to the motion to compel arbitration, which arguments can primarily be grouped into two categories: *first*, that the Master Agreement does not apply to her claims because it expired in November 2016 (*see, e.g.*, Pl. 1st Opp. 4; Pl. 2d Opp. 1-2; Pl. Sur-Reply 1-2); and *second*, that the Master Agreement is invalid (*see, e.g.*, Pl. 1st Opp. 1-3; Pl. 2d Opp. 1-2; Pl. Sur-Reply 1-2).  Even construing Plaintiff's submissions liberally, as is due, *see Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) ("It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" (quoting *Pabon* v. *Wright*, 459 F.3d 241, 248 (2006))), the Court concludes that Plaintiff's claims are governed by the Master Agreement.

### a. The Master Agreement Did Not Terminate or Expire in November 2016

Both Related and RTA assert that Plaintiff was an employee of RTA "at all times," and that RTA "retained control and authority over the terms and conditions of Plaintiff's employment," and was "responsible for the payment of Plaintiff's wages and compensated Plaintiff for the services she provided to Related." (Hoffmann Aff. ¶¶ 10-11; *see also* Related Reply 1-2).  In response, Plaintiff argues that the Master Agreement does not govern her claims because at the time the alleged harassment took place, the Master Agreement had expired, and therefore Related had no authority to assign her to work for one of its subsidiaries.  (*See, e.g.*, Pl. 1st Opp. 2-4; Pl. 2d Opp. 2; Pl. Sur-Reply 1-2).

Plaintiff claims that the Master Agreement expired on November 28, 2016, when the Related employee for whom Plaintiff was filling in returned from maternity leave.  (*See* Pl. 2d Opp. 1; Pl. Sur-Reply 2).  However, Plaintiff's argument does not withstand scrutiny and the evidence before the Court establishes that the Master Agreement did not expire in November 2016.  As an initial matter, Plaintiff offers no evidence beyond her own say-so that her contract with RTA was terminated or expired in November 2016.  (*See generally* Pl. 1st Opp.; Pl. 2d Opp.; Pl. Sur-Reply).  The Master Agreement itself explicitly provides that Plaintiff, "[a]t all times ... shall be and remain an employee of [RTA] and not an employee of the Client."  (Master Agreement ¶ 7).  Furthermore, the Master Agreement does not contain an explicit termination or expiration date, but rather specifies a term that ends when either: (i) Plaintiff is terminated or quits, or (ii) the Client no longer needs Plaintiff's services.  (*Id.* at ¶¶ 2-5).  But the facts alleged by Plaintiff demonstrate that neither of these triggering events occurred in November 2016, or at any point during the time covered in Plaintiff's Complaint.

Plaintiff does not allege that she was terminated or quit on November 28, 2016, and instead states that she was transferred to another Related subsidiary — as contemplated by both the Master Agreement and the TWA — thereby reinforcing Defendants' argument that the Master Agreement still applied.  (*See* Compl., Ex. A; *see also* Master Agreement ¶ 1; TWA; Hoffmann Aff. ¶ 6).  Nor do the allegations in the Complaint show that Plaintiff completed

16

furnishing her services to Related, the other event that terminates the Master Agreement by its own terms.  (*See* Master Agreement ¶ 4 ("The term of this Employment Agreement ... shall continue *through completion of the Employee's Service* unless terminated[.]" (emphasis added))).  Rather, Plaintiff says that Block "asked that [Plaintiff] stay for the month of December and that she would try to get [Plaintiff] a permanent position."  (Compl., Ex. A).  Plaintiff does not allege that she turned Block down.  (*See id.*).  Furthermore, the fact that Plaintiff continued to work at Related (albeit at a different subsidiary) and to collect a salary for her work after November 2016, rather than quitting or refusing to work until signing a new contract, undermines her argument that she considered the Master Agreement to have been terminated or expired.

To the extent Plaintiff suggests that the transfer to another subsidiary itself terminated the Master Agreement (*see* Pl. 1st Opp. 3; Pl. 2d Opp. 2), that argument fails as well.  *First*, as noted above, both the Master Agreement and the TWA provide for the possibility that Related will assign RTA employees to work at multiple Related subsidiaries.  (*See* Master Agreement ¶ 1; TWA; Hoffmann Aff. ¶ 6).  *Second*, Plaintiff continued to act as if she were employed at Related, and not as if she were working without a contract or for a different entity entirely separate from Related.  For example, in addition to the evidence cited above, Plaintiff alleges that roughly a month after she had been transferred to work under Jimenez, she went back to Block, her former supervisor, to complain about Jimenez's behavior, and "asked [Block] to fire

17

[her.]"  (Compl., Ex. A).  This suggests that Plaintiff still considered Block to have the authority to fire her, and undermines Plaintiff's claim that the transfer was a complete break from her initial placement.  (*Id.*; *see also* Pl. 1st Opp. 2 (alleging that the subsidiary to which Plaintiff was transferred in December 2016 was still "headed by" Block)).  Additionally, Plaintiff alleges that she complained to the Related Defendants about Jimenez's behavior, suggesting that she considered Related to have control over Jimenez and the subsidiary where he worked.  (*See* Compl., Ex. A).  In sum, the facts before the Court support Defendants' argument that the Master Agreement remained in effect after November 28, 2016.

### b.    The Master Agreement Is Not Invalid

Plaintiff also argues that the Master Agreement is invalid because there are two copies of the Master Agreement submitted to the Court.  (*See, e.g.*, Pl. 2d Opp. 1 ("[RTA] having two contracts questioned the legality of both contracts.")).  "Allegations that one party 'secretly substituted one type of document for another,' ... 'go to the initial validity of the agreements.'"  *Red Fort Capital, Inc.* v. *Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 474 (S.D.N.Y. 2019) (quoting *Schaeffer* v. *Kessler*, No. 12 Civ. 8576 (PKC), 2013 WL 1155587, at *7 (S.D.N.Y. Mar. 20, 2013)).  The Court liberally construes this argument as one for fraud in the execution, "which 'occurs where there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a reasonable opportunity to know

18

of its character or essential terms.'" *Id.* (quoting *Del Turco* v. *Speedwell Design*, 623 F. Supp. 2d 319, 335-36 (E.D.N.Y. 2009)).

However, Plaintiff does not actually allege that Defendants substituted one document for another, nor that the Master Agreement is forged, nor that Defendants misrepresented the essential terms of the Master Agreement. Rather, Plaintiff simply argues that the existence of two copies of the same contract somehow invalidates the agreement. (*See, e.g.*, Pl. Opp. 1). As Defendants note, the two contracts are in fact identical. (*See* Hoffmann Reply Aff. ¶¶ 2-3; Related Reply 1). The only difference is immaterial: one copy has Plaintiff's digital signature, and the other has her physical signature. (*See* Pl. 2d Opp. (attaching both versions of the Master Agreement)). There is no evidence that either copy of the Master Agreement is improper in any way. As such, Plaintiff offers only "general denials of the facts on which the right to arbitration depends," and fails to "submit evidentiary facts showing that there is a dispute of fact to be tried." *Neidhardt*, 56 F.3d at 358. Thus, the Court concludes that the Master Agreement is enforceable and was in effect at the time the alleged harassment occurred.

### 2.    The Arbitration Agreement Encompasses Plaintiff's Claims

Having found the Master Agreement to be enforceable, the Court next considers whether the Arbitration Provision is applicable. Courts generally construe arbitration clauses broadly. *See, e.g.*, *McMahan Sec. Co. L.P.* v. *Forum Capital Mkts., L.P.*, 35 F.3d 82, 88 (2d Cir. 1994) ("[F]ederal policy favoring

arbitration requires us to construe arbitration clauses as broadly as possible[.]" (internal quotation marks omitted)); *accord Collins & Aikman Prods. Co.* v. *Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995).  That is particularly true where the agreement itself uses broad language to define the scope of arbitration, which language "creates a presumption of arbitrability." *Daly*, 939 F.3d at 421.  That presumption "is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Smith/Enron Cogeneration Ltd. P'ship* v. *Smith Cogeneration Int'l*, 198 F.3d 88, 99 (2d Cir. 1999).

That the Arbitration Provision contains broad language is irrefutable. Under the agreement, Plaintiff must arbitrate "*any dispute* arising between [Plaintiff and RTA] or between [Plaintiff] and Client concerning [Plaintiff's] employment ... as well as any claim by [Plaintiff] of employment discrimination or improper treatment in connection with such employment." (Master Agreement ¶ 13 (emphasis added)).  The Arbitration Provision also includes a non-exhaustive list of claims that it covers.  That list explicitly references claims based upon "Title VII of the Civil Rights Act of 1866, 1964, and 1991, ... New York State and City Human Rights Law or any other additional, related or comparable federal, state or local statute, regulation or ordinance or otherwise." (*Id.*).

Thus, Plaintiff's claims fall squarely within the terms of the Arbitration Provision.  All are covered by the Agreement's reference to "any dispute arising

between [Plaintiff and RTA] or between [Plaintiff] and Client concerning [Plaintiff's] employment." (Master Agreement ¶ 13). Furthermore, the Arbitration Provision explicitly states that "any claim by [Plaintiff] of employment discrimination or improper treatment in connection with such employment shall be submitted to arbitration." (*Id.*). And Plaintiff's Title VII claims are captured within the provision's illustrative list of arbitrable claims. (*Id.*). For these reasons, the Court finds that the Arbitration Agreement encompasses Plaintiff's claims, and Plaintiff's claims must be referred to arbitration.[6]

### 3.   The Case Is Stayed Pending Arbitration

The Court has found that the Master Agreement is enforceable and that Plaintiff's claims fall within the broad scope of its Arbitration Provision; therefore the Court must now decide whether to dismiss or stay the action.

---

[6]   Plaintiff also argues that RTA improperly shared a copy of the Master Agreement with Related, and that the disclosure of the Master Agreement violated an unspecified confidentiality agreement and Plaintiff's privacy. (*See, e.g.*, Pl. 1st Opp. 1). Plaintiff points to no confidentiality agreement that prohibits RTA from disclosing the Master Agreement to Related or any other entity. The Master Agreement itself contains a confidentiality provision, but that provision prohibits Plaintiff from disclosing confidential information about Related and does not say that the Master Agreement itself is confidential. (*See* Master Agreement ¶ 9). To the extent Plaintiff asserts any claims premised on a violation of privacy or breach of a confidentiality agreement, the broad Arbitration Provision in the Master Agreement requires that all of those claims be submitted to arbitration as well.

Additionally, Plaintiff argues that it was improper for Related to assign her to work for a different subsidiary after the return of the employee who was out on maternity leave. (*See, e.g.*, Pl. 2d. Opp. 2). To the extent Plaintiff asserts any claims premised on this allegation, the broad Arbitration Provision in the Master Agreement requires that those claims be submitted to arbitration, because they too constitute "dispute[s] arising ... between [Plaintiff] and Client concerning [Plaintiff's] employment." (Master Agreement ¶ 13).

When all claims have been referred to arbitration and a stay is requested, the Court must grant the stay.  *See Katz* v. *Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).  However, when a stay is not requested, the district court has discretion in determining whether to stay or dismiss the case pending arbitration.  *See Benzemann* v. *Citibank N.A.*, 622 F. App'x 16, 18 (2d Cir. 2015) (summary order) (concluding that district court was not required to enter a stay where parties did not request one); *see also Castellanos* v. *Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 302 (E.D.N.Y. 2018) ("Although defendant's motion requests that the Court dismiss the action, the Court concludes that a stay is appropriate.").

Here, Defendants request dismissal of this action.  (See RTA Br. 8; Related Reply 2).  Following *Katz*, courts in this Circuit regularly stay, rather than dismiss, complaints subject to an arbitration agreement.  *See, e.g.*, *TIG Ins. Co.* v. *Am. Home Assurance Co.*, No. 18 Civ. 10183 (VSB), 2020 WL 605974, at *4 (S.D.N.Y. Feb. 7, 2020); *Porcelli* v. *JetSmarter, Inc.*, No. 19 Civ. 2537 (PAE), 2019 WL 2371896, at *4 (S.D.N.Y. June 5, 2019); *Crawley* v. *Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228 (KPF), 2017 WL 2297018, at *6 (S.D.N.Y. May 25, 2017).  As the Second Circuit has observed, a stay permits the parties to move their dispute "out of court and into arbitration as quickly and easily as possible." *Katz*, 794 F.3d at 346.  A stay would also allow the Court, at a later stage, to address any claim or lingering issue that is not resolved in arbitration.  *See Zambrano* v. *Strategic Delivery Sols., LLC*, No. 15

Civ. 8410 (ER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016).

Accordingly, the Court stays the action pending arbitration of Plaintiff's claims.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to compel arbitration is GRANTED and Defendants' motion to dismiss is DENIED.  The Clerk of Court is ORDERED to terminate the motion at docket entry 17 and to STAY this case.  The parties are ORDERED to update the Court on or before April 29, 2021, regarding the status of any arbitration.  The Clerk of Court is directed to mail a copy of this Order to Plaintiff.

SO ORDERED.

Dated:   January 19, 2021
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

23